UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARDENSENSOR, INC., a Delaware Corporation, formerly known as PLANTSENSE, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>BLACK & DECKER (U.S.), INC., a Maryland Corporation,<br><br>Defendant. | Case No. 12-cv-03922 NC<br><br>**ORDER DENYING PLANTSENSE'S MOTION FOR A NEW TRIAL**<br><br>Re: Dkt. No. 230 |

Plaintiff PlantSense moves for a new trial in this breach of contract action. PlantSense contends that the jury's verdict in Black & Decker's favor is contrary to the clear weight of the evidence and is an improper "compromise verdict." Having considered the evidence and weighed the credibility of the witnesses, the Court does not have a firm conviction that the jury has made a mistake or reached a "compromise verdict." Accordingly, the motion for a new trial is DENIED.

## I. BACKGROUND

This action arises out of a contract (the "EasyBloom Agreement") entered into between PlantSense (also known as "Gardensensor") and Black & Decker. *See* Dkt. No. 220 at 2. The EasyBloom Agreement concerned the PlantSmart product, which is a gardening tool that takes soil, water and light readings and provides users with information

about their home plants and garden plants through the Internet. *Id.* Pursuant to the EasyBloom Agreement, the PlantSmart product was sold by Black & Decker under the Black & Decker brand name. *Id.* PlantSense brought this lawsuit, claiming that Black & Decker breached the EasyBloom Agreement causing monetary damages to PlantSense. *Id.*

The case was tried to a jury over the course of seven days. Dkt. No. 223. The Court instructed the jury that, to recover damages for breach of contract, PlantSense had to prove by a preponderance of the evidence, among other things, that Black & Decker failed to perform "one or more terms of the contract" and that PlantSense was harmed by that failure. Dkt. No. 220 at 7.

The jury instructions explained that PlantSense claimed Black & Decker failed to do the following in breach of the contract between PlantSense and Black & Decker:

> (a) Provide PlantSense every month during the term of the agreement with an updated 12-month delivery and forecast schedule for the PlantSmart product;
>
> (b) Make reasonable commercial efforts to obtain orders for the PlantSmart product with sales efforts normal for Black & Decker's business;
>
> (c) Commit marketing funds that Black & Decker reasonably determined were necessary to support the launch and sale of the PlantSmart product;
>
> (d) Meet the $350,000 minimum marketing placement spend by December 4, 2010; []
>
> (e) Make reasonable efforts to support the PlantSmart product with marketing spends normal for Black & Decker's business;
>
> (f) Provide reasonable evidence to PlantSense that shows that the marketing activity described in subsections (c), (d), and (e) above has taken place.

Dkt. No. 220 at 8.

With respect to damages, the Court instructed the jury in pertinent part as follows:

> If you find that Black & Decker committed a breach of contract, PlantSense is entitled to compensation in an amount that will place it in the same position it would have been in if the contract had been properly performed. In assessing damages, you must consider how PlantSense's position would have been different "but-for" Black & Decker's breach of the contract. The measure of damages is the loss actually sustained as a result of the breach of the contract. PlantSense has the burden of proving damages by a preponderance of the evidence.

*Id.* at 11.

Case No. 12-cv-03922 NC
ORDER DENYING MOTION
FOR A NEW TRIAL
2

The Court further instructed the jury that:

> PlantSense bears the burden of showing that its lost profit damages were the immediate, direct, and proximate result of the alleged breach of contract by Black & Decker. PlantSense's lost profit damages would be considered the direct result of the breach if they are precisely what PlantSense bargained for, and only an award of damages equal to lost profits will put PlantSense in the same position it would have occupied had the contract been performed.
>
> To recover the damages it seeks, PlantSense bears the burden of proving with reasonable certainty that a breach of the contract by Black & Decker caused PlantSense an injury. Reasonable certainty is not the same as absolute certainty. Rather, reasonable certainty merely means that the fact of damages must not be speculative. Once the fact of damage is established, PlantSense does not need to prove the amount of damages with mathematical accuracy. However, PlantSense must provide evidence offering some reasonable basis upon which you may estimate with a fair degree of certainty the probable loss which PlantSense will sustain in order to enable you to make an intelligent determination of the extent of the loss. The fact that there might be some uncertainty as to PlantSense's damage or the fact that the damage might be very difficult to measure will not preclude you from determining its value.
>
> If you find that Black & Decker's conduct created any of the uncertainties that may make estimating PlantSense's damages less than a mathematically precise exercise, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. However, the damages may not be determined by mere speculation or guess. If you find that the fact of such lost profits is speculative or that the amount of any lost profits is unproven, then you may not award damages for lost profits.
>
> Also, in calculating such damages, you must calculate net profit: the amount by which PlantSense's gross revenue would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.
>
> Lost profits on a new business may be too speculative to allow recovery if there is no evidence that the business would be profitable, but recovery for lost profits is not denied merely because a business is newly established. A new business, like an existing business, must prove lost profits with reasonable certainty.

*Id.* at 12-13.

The jury returned a unanimous verdict, finding that (1) PlantSense proved by a preponderance of the evidence that PlantSense substantially complied with the terms of its contract with Black & Decker; (2) PlantSense proved by a preponderance of the evidence that Black &Decker failed to perform one or more terms of its contract with PlantSense; and (3) PlantSense did not prove by a preponderance of the evidence that Black & Decker's failure to perform one or more terms of its contract with PlantSense was a direct and

proximate cause of harm to PlantSense.  Dkt. No. 224.

PlantSense then filed this motion for a new trial, contending that the jury's finding that Black & Decker's breach of the EasyBloom Agreement did not harm PlantSense is "contrary to the clear weight of the evidence" and is an improper "compromise verdict." Dkt. No. 230-1.

## II. LEGAL STANDARD

Rule 59 of the Federal Rules of Civil Procedure provides that the court may grant a motion for a new trial "on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)).

Where a movant claims that a verdict is against the clear weight of the evidence, a new trial should be granted where, after giving full respect to the jury's findings, "the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2806, at 48-49 (1973)).  In ruling on a motion for a new trial, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Id.* at 1371.  The authority to grant a new trial "is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).

//

## III. DISCUSSION

**A.   The Clear Weight Of The Evidence Does Not Compel the Conclusion That Black & Decker Breached Its "Substantive" Marketing Duties.**

PlantSense argues that the jury's finding that Black & Decker's breach of the EasyBloom Agreement did not harm PlantSense is "contrary to the clear weight of the evidence." Dkt. No. 230-1.  The Court instructed the jury that PlantSense claimed a number of different breaches by Black & Decker.  *See* Dkt. No. 220 at 8.  Black & Decker correctly points out that the verdict form, which asked the jury to find if Black & Decker failed to perform "one or more terms of its contract" with PlantSense, allowed the jury to find technical reporting breaches of the EasyBloom Agreement, but no harm caused thereby. Dkt. Nos. 224, 231.  PlantSense did not ask for a verdict form that would require the jury to identify the specific breach they found.  Nevertheless, PlantSense's motion for new trial is based on the premise that the jury found that Black & Decker did not fulfill its contractual marketing obligations, as opposed to a reporting requirement about marketing.  This is justified, according to PlantSense, because "[a]ny finding that Black & Decker did not breach at least one substantive duty to market and sell PlantSmart would be contrary to the clear weight of the evidence and, therefore, warrant a new trial in and of itself." Dkt. No. 232.  The Court disagrees.

PlantSense asserts that the evidence at trial showed that, during the eight months that Black & Decker marketed PlantSmart, Black & Decker spent far less than what it normally spent to market comparable "drive" items or what Black & Decker had originally planned to spend to market PlantSmart.  Dkt. No. 230-1.  PlantSense points to evidence that Black & Decker classified PlantSmart as a "Tier A" product, or "drive item," meaning that PlantSmart was supposed to get the "most amount of focus and effort and investment" from Black & Decker.  Dkt. No. 230-7 (Weetenkamp Tr. at 88-89).  Evidence was also presented that the money spent on the PlantSmart DRTV commercial was very different from the DRTV money that had been spent on some other Black & Decker products. Dkt. No. 230-3 (Cunningham Tr. at 902-905).  Black & Decker historically spent $500,000 on the

production of a DRTV commercial, Dkt. No. 230-6 (Pfister Tr. at 357), and spent upwards of $1 million to air DRTV commercials for some other products.  Dkt. No. 230-5 (McHugh Tr. at 69-77); Dkt. No. 230-3 (McHugh Tr. at 1020-21; Cunningham Tr. at 928-32); Dkt. No. 230-23 (PX29).  While Black & Decker had originally planned to spend in excess of $1 million on a DRTV campaign for PlantSmart, it actually spent $60,000 to produce and $100,000 to air the PlantSmart DRTV commercial.  Dkt. No. 230-19 (PX23); Dkt. No. 230-3 (Cunningham Tr. at 902, 905; McHugh Tr. at 1021).  Unlike other Black & Decker DRTV campaigns that were national, Dkt. No. 230-5 (McHugh Tr. at 24), Black & Decker ran the PlantSmart DRTV campaign in three markets, for three weeks.  Dkt. No. 230-3 (Cunningham Tr. at 905); Dkt. No. 230-5 (McHugh Tr. at 64-65).  In the three markets where Black & Decker ran the PlantSmart DRTV commercial, PlantSmart was available in a total of fourteen Home Depot stores.  Dkt. No. 230-3 (Isch Tr. at 1131; McHugh Tr. at 1023).  PlantSense argues that Black & Decker should have instead spent $500,000 to produce a DRTV commercial and more than $1 million to air the commercial nationally.  Dkt. No. 232.

In response, Black & Decker asserts that the EasyBloom Agreement did not require "drive" or "Tier A" treatment of PlantSmart.  Dkt. No. 231.  Instead, Black & Decker agreed to "commit the marketing funds that it reasonably determines are necessary to support the launch and sale" of PlantSmart and to make "reasonable efforts to support the [PlantSmart] Product with marketing spends normal for their business."  Dkt. No. 231-5 (PX1, Section 3.2); *see also* Dkt. No. 220 at 8.  Moreover, evidence was presented that it was normal for budgets at Black & Decker to be changed.  Dkt. No. 231-4 (McHugh Tr. at 993).  Specifically, witnesses testified that if a DRTV test was successful, Black & Decker would increase the DRTV budget and expand the campaign to additional markets; by contrast, a poor DRTV test would result in decreased budget.  Dkt. No. 231-8 (Pfister Tr. at 21-22); Dkt. No. 231-9 (Romjue Tr. at 246-48).  The three-week DRTV test campaign for PlantSmart resulted in 16 sales.  Dkt. No. 231-4 (McHugh Tr. at 993; Weetenkamp Tr. at 1271).  The evidence at trial did not demonstrate that other products were normally treated

any differently.

Furthermore, Black & Decker asserts that the evidence at trial showed that the marketing efforts and marketing funds for PlantSmart were extraordinary and exceeded normal levels of spending for the rest of its product line. Dkt. No. 231. Evidence was presented that, while the normal ratio of marketing spend to sale price for a new Black & Decker product was approximately five percent, PlantSmart received more than one hundred percent of the sale price in marketing spending. Dkt. No. 231-4 (Weetenkamp Tr. at 1287). The marketing spend for PlantSmart represented 10 percent of the entire marketing budget for Black & Decker's 300 product outdoor product group. *Id.* at 1285-86. In the relevant time period only approximately two percent of all new Black & Decker products received either DRTV or traditional television commercials. *Id.* at 1292. The total amount that Black & Decker spent on PlantSmart was $2.4 million, $642,000 of which was spent on marketing and promotion. *Id.* at 1278. There was also extensive testimony about Black & Decker's efforts to market and sell PlantSmart, including among other things a dedicated PlantsSmart-only email to hundreds of thousands of Black & Decker customers, the first-ever (and only) inclusion of a Black & Decker product as a recommended holiday gift by Home Depot in a communication directed to its customers, point-of-sale displays, dedicated web site, videos, search-engine marketing, hundreds of articles, social media, and blogger outreach. Dkt. No. 231-4 (McHugh Tr. at 962-984; Isch Tr. at 1127-28). There was also testimony about the "blood, sweat and tears" that Black & Decker employees devoted to PlantSmart, and that no matter how hard they were pushing PlantSmart, they could not make store buyers take the product. Dkt. No. 231-9 (Romjue Tr. at 278-81). The Court finds that this testimony was credible.

Black & Decker also argues that while it is possible to find a few Black & Decker products that received more spending than PlantSmart, the products used by PlantSense in its comparison had significant "big box" retailer penetration, unlike PlantSmart. Dkt. No. 231-4 (Weetenkamp Tr. at 1290-92). PlantSense did not present evidence of any other Black & Decker product that received in excess of $1 million in DRTV spending after an

Case No. 12-cv-03922 NC
ORDER DENYING MOTION                     7
FOR A NEW TRIAL

unsuccessful DRTV test without meaningful retail penetration.

In addition to the "scaled-down" DRTV campaign, PlantSense contends that Black & Decker breached its contractual obligation to market PlantSmart when it composed an "exit plan" and its media spend for the product went to zero beginning in about May 4, 2011. Dkt. No. 232; Dkt. No. 230-3 (Cunningham Tr. at 925-26; Weetenkamp Tr. at 1283, 1317); Dkt. No. 230-30 (PX39).

But by mid-2011, PlantSmart had failed in a DRTV test campaign, retailers had refused to stock it, Black & Decker had spent approximately $32 per unit attempting to market products it had spent $19.50 to make, Black & Decker had an inventory of 53,000 unsold units, and Amazon would only take it below Black & Decker's cost. Dkt. No. 231-4 (Weetenkamp Tr. at 1271, 1275-78, 1286-87). PlantSense did not present evidence showing that it was normal for Black & Decker's business to commit additional marketing spend on a product in similar circumstances.

After weighing the evidence and considering the credibility of the witnesses, the Court finds that the clear weight of the evidence does not compel the conclusion that Black & Decker breached its "substantive" marketing duties.

**B.    The Clear Weight Of The Evidence Does Not Compel the Conclusion That Black & Decker's Breach Caused PlantSense's Harm.**

PlantSense also contends that a new trial is required because the clear weight of the evidence demonstrates a proximate causal link between Black & Decker's breach of its marketing obligations and PlantSmart sales volumes. Dkt. No. 230-1. This contention is based on the argument that the jury found that Black & Decker breached its "substantive" marketing duties, which the Court already rejected. However, even if the jury did find that Black & Decker breached its "substantive" marketing duties, PlantSense's contention that the clear weight of the evidence demonstrates the breach caused PlantSense's harm nevertheless fails.

In support of its contention, PlantSense points to evidence at trial that Black & Decker's own market research showed that there was consumer interest in PlantSmart, see

e.g., Dkt. No. 230-9 (PX4); Dkt. No. 230-3 (Glenn Tr. at 279-81). Dkt. No. 231 at 12-13. Additionally, Black & Decker recognized that it was imperative to create consumer awareness for PlantSmart, see, e.g., Dkt. No. 230-31 at 10 (PX 44); Dkt. No. 230-3 (Glenn Tr. at 442), and that its job was to convince the retailers that Black & Decker was behind the product, see e.g., Dkt. No. 230-7 (Weetenkamp Tr. at 92). Dkt. No. 231 at 12-14. There was evidence that Black & Decker projected a 50% increase in PlantSmart sales volumes with a DRTV campaign, see e.g. Dkt. No. 230-6 (Pfister Tr. at 180-81, 191-94, 212-15); Dkt. No. 230-10 (PX8). Dkt. No. 231 at 12-14. PlantSense also relies on evidence that during the thirty-two months in which PlantSmart and its predecessor products were marketed, the product sold in every single month, whereas, upon Black & Decker's cancellation of marketing spend, struggled to sell any further units. Dkt. Nos. 230-1 at 10-11, 22-23; 232.

  In response, Black & Decker contends that PlantSense demonstrated no causal connection between that theoretical marketing shortfall and actual damages. Dkt. No. 231. At trial and in its pending motion, PlantSense rested much of its case on Black & Decker's projections and hopes that the product would sell if there is consumer awareness. Hopes and projections, however, do not always materialize. PlantSense offered no evidence that any additional reasonable marketing spending would have increased sales. In fact, there was evidence to the contrary. There was extensive testimony about PlantSmart's pre-Black & Decker marketing and publicity successes, which included three appearances on The Today Show. Despite these publicity successes, the monthly sales of PlantSmart remained generally low. Dkt. No. 231-4 (Glenn Tr. at 526-37). There was also evidence presented of a Power Point Presentation prepared by PlantSense's former Vice President of Marketing and Product Management, showing that 252% increased marketing spend by Black & Decker compared to PlantSense coincided with *decreased* sales in at least some retail outlets. Dkt. No. 231-4 (Byerley Tr. at 741, 769, 770-71); Dkt. No. 231-13 (PX5). Moreover, the fact that PlantSmart sold during the thirty-two months in which it was marketed does not equate with the claim that the product would have been profitable had

Black & Decker made additional reasonable marketing spending.  The jury was entitled to conclude that PlantSense's claim that any additional reasonable marketing spending would have resulted in profits for PlantSense was speculative and not reasonably certain.

The Court is also not convinced by PlantSense's argument that by offering an alternative expert opinion on damages, Black & Decker conceded causation. Dkt. No. 230-1 at 23-24.  Black & Decker's damages expert made clear that he had not done any analysis to determine whether sales volumes would have been different if Black & Decker had performed any differently under the EasyBloom Agreement.  Dkt. No. 231-4 (Ehlert Tr. 1227, 1250, 1252, 1259).

Having considered the evidence and weighed the credibility of the witnesses, the Court does not have a firm conviction that the jury has made a mistake.  Accordingly, the Court cannot find that the jury's verdict was contrary to the clear weight of the evidence.

## C.     The Verdict Is Not an Improper "Compromise Verdict."

As an alternative basis to grant a new trial, PlantSense contends that the jury's finding that Black & Decker breached the EasyBloom Agreement, coupled with its failure to award any damages, "strongly suggest that the jury rendered an improper compromise verdict." Dkt. No. 230-1; *see James v. Sheklanian*, No. 08-cv-01943, 2010 WL 3504804, at *4 (E.D. Cal. Sept. 7, 2010) ("A compromise verdict 'is one reached when the jury, unable to agree on liability, compromises that disagreement by entering a low award of damages.'" (quoting *National Railroad Passenger Corp. v. Koch Industries, Inc.*, 701 F.2d 108, 110 (10th Cir. 1983)).  The facts in *James*, however, are starkly different.  In *James*, the jury found that an officer unlawfully used excessive force in the arrest of the plaintiff.  2010 WL 3504804, at *1.  But although it was undisputed that the plaintiff suffered injuries as a result of the officer's tackling, punching, and tasing, the jury found that the officer's use of excessive force was not the cause of harm to plaintiff. *Id.* at *5.

Here, PlantSense asserts that "no rational juror could find that PlantSense did not suffer some amount of harm as a result of Black & Decker's breach of the EasyBloom Agreement." Dkt. No. 230-1.  The arguments on which PlantSense relies in support of this

assertion were also made in connection with its contention that the verdict is against the clear weight of the evidence and fail for the same reasons discussed above. There is nothing here that indicates that the jury reached an improper "compromise verdict."

## IV. CONCLUSION

The Court finds that the jury's verdict in Black & Decker's favor is not contrary to the clear weight of the evidence and is not an improper "compromise verdict." Accordingly, PlantSense's motion for a new trial is DENIED.

IT IS SO ORDERED.

Date: March 20, 2015

_____
Nathanael M. Cousins
United States Magistrate Judge